IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT LOUISIANA

_____

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, THE COMMONWEALTH OF KENTUCKY DEPARTMENT FOR ENVIRONMENTAL PROTECTION, AND THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY, | ) ) ) ) ) ) ) | |
| | ) | Civil Action No. |
| Plaintiffs, | ) ) | Judge |
| v. | ) ) | Magistrate |
| WESTLAKE CHEMICAL OPCO LP, WESTLAKE PETROCHEMICALS LLC, WESTLAKE POLYMERS LLC, WESTLAKE STYRENE LLC, and WESTLAKE VINYLS, INC., | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

_____

## COMPLAINT

Plaintiffs, the United States of America ("United States"), by the authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), the Commonwealth of Kentucky Department for Environmental Protection (the "KDEP"), and the Louisiana Department of Environmental Quality (the "LDEQ"), file this Complaint and allege as follows:

## NATURE OF ACTION

1.      This civil action seeks injunctive relief and civil penalties from Defendants, Westlake Chemical OpCo LP, Westlake Petrochemicals LLC, Westlake Polymers LLC, Westlake Styrene LLC, and Westlake Vinyls, Inc. (collectively, the "Defendants") for violations

of the Clean Air Act, 42 U.S.C. § 7401 *et seq.* ("Clean Air Act"), Kentucky Revised Statutes ("KRS") Chapter 224 (Environmental Protection), the Louisiana Environmental Quality Act, La. R.S. 30:2001 *et seq.* ("Louisiana Environmental Quality Act"), the regulations promulgated pursuant to those statutes, and the operating permits that incorporate those requirements.

2.     The United States brings this case pursuant to Clean Air Act Sections 113(b) and 167, 42 U.S.C. §§ 7413(b) and 7477, based on the Defendants' alleged failures to adhere to good air pollution control practices, including their failures to properly operate, maintain, monitor, and control air-assisted and steam-assisted flares used at a petrochemical manufacturing facility located in the Commonwealth of Kentucky and two such facilities located in the State of Louisiana.

3.     Defendants Westlake Vinyls, Inc. and Westlake Chemical OpCo LP own and operate the petrochemical manufacturing plant located at 2468 Industrial Parkway, Calvert City, Kentucky 42029 (the "Calvert City Plant"). Defendants Westlake Chemical OpCo LP, Westlake Petrochemicals LLC, and Westlake Styrene LLC own and operate the petrochemical manufacturing plant located at 900 Highway 108, Sulphur, Louisiana 70665 (the "Lake Charles Petro Plant"). Westlake Polymers LLC owns and operates the petrochemical manufacturing plant located at 3525 Cities Service Hwy, Sulphur, Louisiana, 70665 (the "Lake Charles Poly Plant"). The Lake Charles Petro Plant and Lake Charles Poly Plant are collectively referred to as the "Lake Charles Plants." The Calvert City Plant and the Lake Charles Plants are collectively referred to as the "Defendants' Facilities."

4.     The KDEP brings this case pursuant to KRS Chapter 224 based on these same failures at the Calvert City Plant. The LDEQ brings this case pursuant to the Louisiana Environmental Quality Act based on these same failures at the Lake Charles Plants.

5.      The Defendants' alleged violations of the Clean Air Act, KRS Chapter 224, and the Louisiana Environmental Quality Act resulted in thousands of tons of illegal emissions of volatile organic compounds ("VOCs"), hazardous air pollutants ("HAPs"), and other pollutants into the air in the Commonwealth of Kentucky and the State of Louisiana.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter pursuant to Clean Air Act Section 113(b), 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1331, 1345, and 1355. This Court has personal jurisdiction over the Defendants because they do business in the State of Louisiana and in this judicial district.

7.      This Court has jurisdiction pursuant to 28 U.S.C. § 1367 over the KDEP's claims under KRS Chapter 224 and LDEQ's claims under the Louisiana Environmental Quality Act because those claims are so related to the claims alleged in the United States' action that they form part of the same case or controversy.

8.      Venue is proper in this District pursuant to Section 113(b) of the Clean Air Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because a substantial part of the violations alleged in this Complaint occurred at the Defendants' Facilities that are located in this District.

## NOTICE

9.      Notices of violation were given to the Defendants, the Commonwealth of Kentucky, and the State of Louisiana as required by Clean Air Act Section 113(a)(1), 42 U.S.C. § 7413(a)(1). Notice of the commencement of this action was given to the Commonwealth of Kentucky and the State of Louisiana as required by Clean Air Act Section 113(b), 42 U.S.C. § 7413(b).

10.    The 30-day period established in Clean Air Act Section 113(a), 42 U.S.C.

§ 7413(a), between the notices of violation provided by the United States and the

commencement of this civil action has elapsed.

## AUTHORITY

11.    The United States Department of Justice has authority to bring this action on

behalf of the EPA under, *inter alia*, 28 U.S.C. §§ 516 and 519, and under Clean Air Act

Section 305(a), 42 U.S.C. § 7605(a).

## THE DEFENDANTS AND THE DEFENDANTS' FACILITIES

12.    Defendant Westlake Chemical OpCo LP is a Delaware corporation that does

business in the Commonwealth of Kentucky. Defendant Westlake Petrochemicals LLC is a

Delaware company that does business in the State of Louisiana. Defendant Westlake Polymers

LLC is a Delaware company that does business in the State of Louisiana. Defendant Westlake

Styrene LLC is a Delaware company that does business in the State of Louisiana. Westlake

Vinyls, Inc. is a Delaware corporation that does business in the Commonwealth of Kentucky.

13.    The Defendants' Facilities manufacture petrochemicals, including ethylene and

other olefins.

14.    At all times relevant to this Complaint, Defendants Westlake Chemical OpCo LP

and Westlake Vinyls, Inc. have owned and operated the Calvert City Plant, including a steam-

assisted "Ethylene Flare" and an unassisted "Vinyl Chloride Flare" at the Calvert City Plant.

These two flares are collectively referred to as the "Calvert City Flares."

15.    At all times relevant to this Complaint, Defendants Westlake Chemical OpCo LP,

Westlake Petrochemicals LLC, and Westlake Styrene LLC have owned and operated the Lake

Charles Petro Plant, including three steam-assisted and two air-assisted flares (Petro Flare 1,

4

Petro Flare 2, Styrene Flare, Poly 3 LP Flare, and Co-Products Flare) at the Lake Charles Petro Plant. At all times relevant to this Complaint, Westlake Polymers LLC has owned and operated the Lake Charles Poly Plant, including a steam-assisted flare (Poly 1 & 2 Flare) at the Lake Charles Poly Plant. The six flares at the Lake Charles Plants and are collectively referred to herein as the "Lake Charles Flares."

16.    At all times relevant to the Complaint, each of the Defendants has been a "person" within the meaning of Section 302(e) of the Clean Air Act, 42 U.S.C. § 7602(e) and the applicable federal and state regulations alleged herein.

## CLEAN AIR ACT STATUTORY AND REGULATORY BACKGROUND

17.    The Clean Air Act is designed to promote the public's health, welfare, and its productive capacity by protecting and enhancing the nation's air quality. 42 U.S.C. § 7401(b)(1).

### A.    National Ambient Air Quality Standards and "New Source Review"

i.    General

18.    Clean Air Act Section 108(a), 42 U.S.C. § 7408(a), requires that the EPA identify and prepare air quality criteria for certain air pollutants called "criteria pollutants." Criteria pollutants are emitted from numerous or diverse mobile or stationary sources of air pollution, and emissions of criteria air pollutants may endanger public health or welfare. *Id.* For each criteria pollutant, Clean Air Act Section 109, 42 U.S.C. § 7409, requires that the EPA promulgate national ambient air quality standards ("NAAQS") that will protect public health and welfare with an adequate margin of safety.

19.    Pursuant to Clean Air Act Sections 108 and 109, 42 U.S.C. §§ 7408 and 7409, the EPA identified and issued NAAQS for the following criteria air pollutants, as well as for others:

ozone, nitrogen oxides ("NOx"), and carbon monoxide ("CO"). *See* 40 C.F.R. §§ 50.8-50.11 (primary NAAQS); *see also* 40 C.F.R. §§ 50.15 and 50.19 (secondary NAAQS).

20.     VOCs readily react, in the presence of sunlight, with NOx, forming the criteria pollutant ozone.

21.     Pursuant to Clean Air Act Section 107(d), 42 U.S.C. § 7407(d), each state is required to designate those areas within its boundaries (known as "air quality control regions") where the air quality is better or worse than the NAAQS for each criteria pollutant. An area that meets the NAAQS for a particular pollutant is deemed an "attainment" area. An area that does not meet the NAAQS for a particular pollutant is deemed a "non-attainment" area.

22.     At all times relevant to this Complaint, Marshall County, Kentucky, where the Calvert City Plant is located and Calcasieu Parish, Louisiana, where the Lake Charles Plants are located, have been classified as "in attainment" for ozone.

23.     At all times relevant to this Complaint, the areas where the Defendants' Facilities are located have been classified as "in attainment" for $NO_x$ and CO.

ii.     State Implementation Plans

24.     Clean Air Act Section 110, 42 U.S.C. § 7410, requires each state to adopt and submit to the EPA for approval a plan to attain and maintain the NAAQS for each criteria pollutant in each air quality control region within a state. This plan is known as a state implementation plan ("SIP").

25.     A SIP is enforceable by the state in which it is adopted. After a SIP is approved by the EPA, it is also federally enforceable pursuant to Clean Air Act Section 113(b), 42 U.S.C. § 7413(b).

26.     Clean Air Act Section 110(a)(2)(C), 42 U.S.C. § 7410(a)(2)(C), requires that each SIP regulate the "modification and construction of any stationary source . . . as necessary to assure that [NAAQS] are achieved, including [via] a permit program as required in parts C and D of [Subchapter I of the Clean Air Act]." The Clean Air Act's requirements for newly constructed and modified sources of criteria air pollutants are often referred to as the "New Source Review" (or "NSR") program.

27.     Determining which set of New Source Review requirements applies for a newly constructed or modified source of criteria air pollutants depends upon the air quality designation of the air quality control region in which the new or modified facility is located.

                    iii.     Prevention of Significant Deterioration ("PSD") Requirements

28.     Part C of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7470–7492, sets forth requirements to prevent significant deterioration of air quality in attainment areas. *See* 42 U.S.C. § 7470 (Purpose of PSD requirements). The EPA's regulations that implement the PSD program are found at 40 C.F.R. § 52.21 (the "PSD Regulations").

29.     The PSD requirements generally prohibit the construction or modification of a "major emitting facility" in an attainment area unless various requirements are met. *See* 42 U.S.C. § 7475(a). These requirements include, among other things, obtaining a "PSD permit" that contains emission limitations based on the "best available control technology" ("BACT") to control air emissions. *Id.*; *see also* 40 C.F.R. § 52.21(j) – (r). The PSD Regulations also require a demonstration that emissions from a newly constructed or modified facility will not contribute to a violation of a NAAQS. *See* 42 U.S.C. § 7475(a); 40 C.F.R. § 52.21(k).

30.     Clean Air Act Section 169(1), 42 U.S.C. § 7479(1), defines "major emitting facility" to include any chemical process plant that emits or has the potential to emit 100 tons per

year ("TPY") or more of any air pollutant. Major emitting facilities also include any other source with the potential to emit 250 TPY or more of any air pollutant.

31.     The PSD Regulations define "construction" as "any physical change in or change in the method of operation (including fabrication, erection, installation, demolition, or modification) which would result in a change in actual emissions." 40 C.F.R. § 52.21(b)(8). "Construction" is also defined to include the "modification" (as defined in Clean Air Act Section 111(a), 42 U.S.C. § 7411(a)) of any source or facility. 42 U.S.C. § 7479(2)(C).

32.     "Modification" is defined as "any change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. § 7411(a).

33.     The PSD Regulations define "major modification" as "any physical change in or change in the method of operation of a major stationary source that would result in a significant net emission increase of any pollutant subject to regulation under the Act." 40 C.F.R. § 52.21(b)(2)(i).

34.     The PSD Regulations set individual thresholds for each criteria pollutant that define whether a net emissions increase of a pollutant is "significant." *See* 40 C.F.R. § 52.21(b)(23)(i). For example, for ozone, "significant" means a net emissions increase of, or the potential of a source to emit, 40 TPY or more of VOCs or NOx. *Id.*

35.     The PSD Regulations define "net emissions increase" as "the amount by which the sum of the following exceeds zero: (a) any increase in actual emissions from a particular physical change or change in method of operation at a stationary source and (b) any other increases and decreases in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable." 40 C.F.R. § 52.21(b)(3).

36.     In an attainment area, a newly constructed stationary source or a major modification to an existing stationary source must install and operate BACT, as defined in 40 C.F.R. § 52.21(b)(12), for each pollutant subject to regulation under the Clean Air Act that it would have the potential to emit in significant amounts or for which the modification would result in a significant net emissions increase. 40 C.F.R. § 52.21(j)(2)-(j)(3).

iv.     Non-attainment NSR Requirements

37.     Part D of Subchapter I of the Clean Air Act, 42 U.S.C. §§ 7501-7515, sets forth NSR requirements for areas that have not attained NAAQS.

38.     Clean Air Act Sections 110(a)(2)(C) and (I) and 172(c), 42 U.S.C. §§ 7410(a)(2)(C) and (I) and 7502(c), require that each SIP contain requirements to review and permit newly constructed or modified sources of criteria air pollutants in non-attainment areas ("Non-attainment NSR").

39.     Clean Air Act Section 173, 42 U.S.C. § 7503, requires that, in order to obtain a permit for the construction or major modification of a major stationary source in a non-attainment area, the owner and operator of the source must, *inter alia*: a) comply with the lowest achievable emission rate ("LAER"), as defined in Clean Air Act Section 171(3), 42 U.S.C. § 7501(3), and b) obtain federally enforceable emission offsets at least as great as the new or modified source's emissions. *See* 42 U.S.C. §§ 7503(a)-(c); 40 C.F.R. Part 51, Appendix S, Part IV.A, Conditions 1-4.

40.     "Significant" has the same meaning as under the PSD Regulations, except that under the Non-attainment NSR program, lower TPY thresholds may qualify as being significant. 40 C.F.R. § 51.165(a)(1)(x)(B). For example, in areas that are in non-attainment for ozone, lower thresholds may qualify a stationary source of VOCs as a major stationary source. *Id*.

v.      PSD and Non-attainment NSR in Kentucky and Louisiana

41.      Clean Air Act Section 161, 42 U.S.C. § 7471, requires SIPs to contain emission

limitations and such other measures as may be necessary to prevent significant deterioration of

air quality in attainment areas. Clean Air Act Sections 110(a)(2)(C) and (I) and 172(c), 42 U.S.C.

§§ 7410(a)(2)(C) and (I) and 7502(c), require that each SIP contain requirements to attain the

primary NAAQS in non-attainment areas.

42.      A state may comply with Clean Air Act Section 161 (for PSD) or with Clean Air

Act Sections 172 and 173 (for Non-attainment NSR) if the EPA delegates authority to enforce

the respective federal PSD Regulations or Non-attainment NSR regulations to the state. A state

may also comply by promulgating its own PSD Regulations or Non-attainment NSR regulations

that then must be approved by the EPA as part of the SIP. In order to be approved, the state's

PSD Regulations or Non-attainment NSR regulations must be at least as stringent as the

requirements set forth at 40 C.F.R. §§ 51.166 (for PSD) or 51.165 (for Non-attainment NSR).

43.      The EPA has approved Kentucky's PSD and Non-attainment NSR permit

programs. *See* 401 Kentucky Administrative Regulations ("KAR") 51:017 (PSD program); 401

KAR 51:052 (Non-attainment NSR program); *see also* 40 C.F.R. § 52.920(c), Table 1 (EPA

Approved Kentucky Regulations).

44.      The EPA has approved Louisiana's PSD and Non-attainment NSR permit

programs. *See* Louisiana Administrative Code ("LAC") 33:III.509 (PSD program); LAC

33:III.504 (Non-attainment program); s*ee also* 40 C.F.R. § 52.970(c) Table (EPA Approved

Louisiana Regulations in the Louisiana SIP).

45.      At all times relevant herein, Kentucky and Louisiana have been authorized to

issue and enforce PSD and Non-attainment NSR permits. In all respects relevant to this

Complaint, the Kentucky and Louisiana PSD regulations applicable to this action closely, if not exactly, mirror the federal PSD and Non-attainment NSR Regulations at 40 C.F.R. §§ 51.165 and 51.166, and 40 C.F.R. Part 51, Appendix S, Part IV.

46.     Pursuant to Clean Air Act Section 113(b), 42 U.S.C. § 7413(b), and 40 C.F.R. § 52.23, the EPA may enforce violations of Kentucky's and Louisiana's federally approved PSD programs and Non-attainment NSR programs, as well as violations of permits issued pursuant to those programs.

### B.    New Source Performance Standards

#### i.    Background

47.     Clean Air Act Section 111(b)(1)(A), 42 U.S.C. § 7411(b)(1)(A), requires the EPA to publish and periodically revise a list of categories of stationary sources that, in the EPA's judgment, cause or contribute significantly to air pollution which may reasonably be anticipated to endanger public health or welfare. These categories generally correspond to distinct manufacturing processes or equipment within a given industry.

48.     Once a category is included on the list, Clean Air Act Section 111(b)(1)(B), 42 U.S.C. §7411(b)(1)(B), requires the EPA to promulgate a federal "New Source Performance Standard" ("NSPS") to regulate emissions from new sources within the category.

49.     Each NSPS is located at 40 C.F.R. Part 60. 40 C.F.R. § 60.1 explains that the provisions of 40 C.F.R. Part 60 "apply to the owner or operator of any stationary source which contains an affected facility, the construction or modification of which is commenced after the publication [in Part 60] of any [NSPS] (or, if earlier, the date of publication of any proposed [NSPS]) applicable to that facility."

50.    "Stationary source" is defined as a building, structure, facility, or installation which emits or may emit any air pollutant. 42 U.S.C. § 7411(a)(3).

51.    "Affected facility" is defined as "any apparatus to which a standard is applicable." 40 C.F.R. § 60.2.

52.    Clean Air Act Section 111(e), 42 U.S.C. § 7411(e), prohibits an owner or operator of a new source from operating that source in violation of an NSPS after the effective date of the NSPS applicable to such source.

ii.    Part 60, Subpart A: NSPS General Standards

53.    Pursuant to Clean Air Act Section 111(b)(1)(B), 42 U.S.C. § 7411(b)(1)(B), the EPA promulgated general regulations that apply to all stationary sources subject to a NSPS, regardless of their industrial category. These general NSPS standards are found at 40 C.F.R. Part 60, Subpart A, §§ 60.1 - 60.19 ("NSPS Subpart A").

a.    NSPS Subpart A: Good Air Pollution Control Practices

54.    Pursuant to 40 C.F.R. § 60.11(d), owners and operators of any affected facility subject to a NSPS must, at all times, including periods of startup, shutdown, and malfunction, to the extent practicable, maintain and operate the affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions.

b.    NSPS Subpart A: Requirements for Flares Used as Control Devices (40 C.F.R. § 60.18)

55.    NSPS Subpart A contains specific regulations that apply to flares that are used as control devices for affected facilities subject to a NSPS. 40 C.F.R. §§ 60.18(b) – (f).

56.    Among other things, NSPS Subpart A requires that flares must be: a) designed and operated with no visible emissions (40 C.F.R. § 60.18(c)(1)), b) operated with a flame

present at all times (40 C.F.R. § 60.18(c)(2)), c) monitored to ensure that they are operated and maintained in conformance with their design (40 C.F.R. § 60.18(d)), and d) operated at all times when emissions are vented to them (40 C.F.R. § 60.18(e)).

57.    NSPS Subpart A also requires, among other things, that: a) the net heating value of gas being combusted in a flare must be 300 British Thermal Units ("BTU") per standard cubic foot ("scf") or greater (40 C.F.R. § 60.18(c)(3)(ii)) and b) certain exit velocity requirements must be met for steam-assisted flares (40 C.F.R. § 60.18(c)(4)) and for air-assisted flares (40 C.F.R. § 60.18(c)(5)).

       iii.    <u>Specific NSPS Categorical Standards</u>

58.    Pursuant to Clean Air Act Section 111(b)(1)(A), 42 U.S.C. § 7411(b)(1)(A), the EPA has promulgated NSPS for the following categories of stationary sources, among others:

| SOURCE CATEGORY | NSPS REGULATION (40 C.F.R. Part 60) |
|---|---|
| Standards of Performance for VOC Emissions from the Polymer Manufacturing Industry | Subpart DDD – 40 C.F.R. §§ 60.560 – 60.566 |
| Standards of Performance for VOC Emissions from Synthetic Organic Chemicals Manufacturing Industry Distillation Operations | Subpart NNN – 40 C.F.R. §§ 60.660 – 60.668 |
| Standards of Performance for Volatile Organic Compound Emissions From Synthetic Organic Chemical Manufacturing Industry (SOCMI) Reactor Processes | Subpart RRR – 40 C.F.R. §§ 60.700 – 60.708 |

59.     Flares used as a control device for affected facilities subject to 40 C.F.R. Part 60, Subparts DDD, NNN, or RRR must comply with the requirements of NSPS Subpart A, including 40 C.F.R. §§ 60.11(d) and 60.18. *See* 40 C.F.R. § 60.1.

60.     40 C.F.R. Part 60, Subparts DDD, NNN, and RRR explicitly require that flares used as a control device for affected facilities subject to those subparts must comply with the requirements of 40 C.F.R. § 60.18. *See* 40 C.F.R. § 60.562-1(a)(1)(i)(C) (Subpart DDD); 40 C.F.R. §§ 60.662(b) and 60.664(d) (Subpart NNN); and 40 C.F.R. §§ 60.702(b) and 60.704(c) (Subpart RRR).

61.     40 C.F.R. Part 60, Subpart DDD, explicitly requires that flares used as a control device for affected facilities subject to that subpart must be monitored to ensure that they are operated and maintained in conformance with their design. *See* 40 C.F.R. § 60.563(c).

### C.     Clean Air Act Section 112 Regulation of HAPs Pre-1990

#### i.     Background

62.     Clean Air Act Section 112 contains requirements to control certain HAPs, such as benzene. *See* 42 U.S.C. § 7412 and 40 C.F.R. § 61.01(a). These requirements are known as "national emission standards for hazardous air pollutants" ("NESHAPs"). NESHAPs established before the Clean Air Act was amended in 1990 are promulgated at 40 C.F.R. Part 61.

#### ii.     Part 61, Subpart A: NESHAP General Standards

63.     Pursuant to Clean Air Act Section 112, 42 U.S.C. § 7412, before it was amended on November 15, 1990 (the "1990 Amendments"), the EPA promulgated general regulations that apply to all stationary sources of HAPs that are subject to the NESHAPs, regardless of their source category. *See* 40 C.F.R. § 61.01(c). These general NESHAP standards are found at 40 C.F.R. Part 61, Subpart A, §§ 61.01–61.19.

64.    Like NSPS Subpart A, Subpart A of the NESHAPs requires that "the owner and operator of each stationary source [of HAPs] shall maintain and operate the source, including associated equipment for air pollution control, in a manner consistent with good air pollution control practices for minimizing emissions." 40 C.F.R. § 61.12(c).

       iii.    <u>Specific Categorical NESHAPs</u>

65.    Pursuant to Clean Air Act Section 112, as it existed before the 1990 Amendments, the EPA promulgated NESHAPs for the following categories of stationary sources of HAPs:

| SOURCE CATEGORY | NESHAP (40 C.F.R. Part 61) |
|---|---|
| National Emission Standard for Vinyl Chloride | Subpart F – 40 C.F.R. §§ 61.60 – 61.71 |
| National Emission Standard for Benzene Waste Operations | Subpart FF – 40 C.F.R. §§ 61.340 – 61.358 |

66.    Flares used as a control device for sources subject to 40 C.F.R. Part 61, Subparts F or FF must comply with the requirements of 40 C.F.R. § 60.18. *See* 40 C.F.R. § 61.65(d)(2) and 40 C.F.R. § 61.349(a)(2)(iii) and (d).

67.    Flares used as a control device for sources subject to 40 C.F.R. Part 61, Subparts F or FF must comply with the requirement that each flare be maintained and operated "in a manner consistent with good air pollution control practice for minimizing emissions." 40 C.F.R. § 61.12(c).

68.    The Clean Air Act's 1990 Amendments did not alter the pre-1990 NESHAPs, and those regulations remain in effect.

**D.    Clean Air Act Section 112 Regulation of HAPs Post-1990**

i.    Background

69.    The Clean Air Act's 1990 Amendments amended Clean Air Act Section 112 and updated the program for controlling HAPs. *See* H.R. Rep. No. 101-490, 101st Cong., 2d Sess., Part 1 at 324 (1990).

70.    The Clean Air Act's 1990 Amendments established a list of 188 HAPs that Congress determined could cause adverse health or environmental effects. *See* 42 U.S.C. § 7412(b)(1). Pursuant to 42 U.S.C. § 7412(c), the EPA was required to publish a list of all categories and sub-categories of, *inter alia*, major sources of HAPs.

71.    Clean Air Act Section 112, as amended, defines "major source" as any stationary source or group of stationary sources located within a contiguous area and under common control that, in the aggregate, emits or has the potential to emit, considering controls, 10 TPY or more of any single HAP or 25 TPY or more of any combination of HAPs. 42 U.S.C. § 7412(a)(1).

72.    Clean Air Act Section 112, as amended, defines "stationary source" in the same way as the term is defined under the NSPS. 42 U.S.C. § 7412(a)(3) and 42 U.S.C. § 7411(a)(3).

73.    After publishing the list of emission sources required by 42 U.S.C. § 7412(c), the Clean Air Act's 1990 Amendments required the EPA to promulgate regulations establishing emission standards for each category and subcategory of major sources of HAPs. *See* 42 U.S.C. § 7412(d)(1).

74.    These emission standards must require the maximum degree of reduction in emissions of HAPs that the EPA, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements,

determines is achievable for the new or existing sources in the category or subcategory to which the emission standard applies. *See* 42 U.S.C. § 7412(d)(2).

75.     If it is not feasible to prescribe or enforce an emission standard for the control of a HAP, the EPA may promulgate "design, equipment, work practice, or operational" standards, which are to be treated as emission standards. 42 U.S.C. § 7412(h)(1).

76.     The emission standards promulgated under Clean Air Act Section 112, 42 U.S.C. § 7412, as amended, are classified as NESHAPs, however, they are often also referred to as "maximum achievable control technology" ("MACT") standards. The MACT regulations are found at 40 C.F.R. Part 63.

77.     Clean Air Act Section 112, as amended, prohibits any person from operating a stationary source subject to a MACT regulation in violation of such standard after it becomes effective. *See* 42 U.S.C. § 7412(i)(3).

ii.      Part 63, Subpart A: MACT General Standards

78.     Pursuant to Clean Air Act Section 112, 42 U.S.C. § 7412, as amended, the EPA promulgated regulations that apply to stationary sources of HAPs that are subject to the MACT standards, regardless of their source category. *See* 40 C.F.R. § 63.1(b) and (c). These general MACT standards are found at 40 C.F.R. Part 63, Subpart A, §§ 63.1–63.16.

79.     The categorical MACT standards in Part 63 explicitly identify which specific provisions of the MACT Subpart A regulations apply or do not apply to that source category. *See* 40 C.F.R. § 63.1(a)(4).

a.      MACT Subpart A: Good Air Pollution Control Practices

80.     Like the good air pollution control practice requirement of NSPS Subpart A and Subpart A of the NESHAPs, the MACT Subpart A regulations require that: "[a]t all times,

including periods of startup, shutdown, and malfunction, the owner or operator must operate and maintain any affected source, including associated air pollution control equipment and monitoring equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions." 40 C.F.R. § 63.6(e)(1)(i).

> b. <u>MACT Subpart A: Requirements for Flares Used as Control Devices (40 C.F.R. § 63.11(b))</u>

81.    Like NSPS Subpart A, the MACT Subpart A regulations include requirements that apply to flares that are used as control devices for affected sources subject to a MACT standard. *See* 40 C.F.R. § 63.11(b). These requirements generally mirror the requirements of 40 C.F.R. § 60.18.

82.    The MACT Subpart A regulations require, among other things, that:

> i.    Flares must be monitored to ensure that they are operated and maintained in conformance with their design. *See* 40 C.F.R. § 63.11(b)(1);
>
> ii.    Flares must be operated at all times when emissions are vented to them. *See* 40 C.F.R. § 63.11(b)(3);
>
> iii.    Flares must be designed and operated with no visible emissions. *See* 40 C.F.R. § 63.11(b)(4);
>
> iv.    Flares must be operated with a flame present at all times. *See* 40 C.F.R. § 63.11(b)(5);
>
> v.    Flares must be operated so that the gas being combusted in it has a net heating value of 300 BTU per scf or greater. *See* 40 C.F.R. § 63.11(b)(6)(ii); and
>
> vi.    Flares must be operated in accordance with exit velocity requirements. *See* 40 C.F.R. §§ 63.11(b)(7) (for steam-assisted flares) and 63.11(b)(8) (for air-assisted flares).

> iii.    <u>Specific Categorical MACT Standards</u>

83.    Pursuant to Clean Air Act Section 112(c), 42 U.S.C. § 7412(c), as amended, the EPA promulgated MACT regulations for the following categories of stationary sources of HAPs:

| SOURCE CATEGORY | MACT (40 C.F.R. Part 63) |
|---|---|
| National Emission Standards for Organic HAPs for Equipment Leaks | Subpart H – 40 C.F.R. §§ 63.160 – 63.183 |
| National Emission Standards for Closed Vent Systems, Control Devices, Recovery Devices and Routing to a Fuel Gas System or a Process | Subpart SS – 40 C.F.R. §§ 63.980 – 63.999 |
| National Emission Standards for HAPs for Source Categories: Generic Maximum Achievable Control Technology Standards | Subpart YY – 40 C.F.R. §§ 63.1100 – 63.1114 |
| National Emission Standards for HAPs: Miscellaneous Organic Chemical Manufacturing | Subpart FFFF – 40 C.F.R. §§ 63.2430 – 63.2550 |

84.     Flares used as a control device for sources subject to 40 C.F.R. Part 63, Subparts H, SS, YY, and FFFF must comply with the requirements of 40 C.F.R. § 63.11(b). *See* 40 C.F.R. Part 63, Subpart F, Table 3 (applicability for Subpart H); 40 C.F.R. Part 63.172(d) and (e) (Subpart H); 40 C.F.R. § 63.987(a) (Subpart SS); 40 C.F.R. § 63.1103(e), Table 7 (applicability for Subpart YY ethylene production sources) (cross-referencing 40 C.F.R. §§ 63.982(b) and, in turn, 63.987(a)); and 40 C.F.R. Part 63, Subpart FFFF, Table 12.

85.     Under Part 63, Subpart YY, owners and operators of an ethylene process vent must reduce emissions of organic HAPs by 98 weight-percent, or reduce organic HAPs or total organic compounds ("TOC") to a concentration of 20 ppmv, whichever is less stringent, by venting emissions through a closed vent system to any combination of control devices, including flares, and meeting the requirements specified in 40 C.F.R. § 63.982(b) and (c)(2). 40 C.F.R. § 63.1103(e)(3) and Table 7 at (d).

86.    Flares used as a control device for sources subject to 40 C.F.R. Part 63, Subpart FFFF, must comply with the requirement in 40 C.F.R. § 63.6(e)(1)(i) that each flare be maintained and operated "in a manner consistent with good air pollution control practice for minimizing emissions." *See* 40 C.F.R. Part 63, Subpart FFFF, Table 12.

### E.    Title V Operating Permits

87.    Title V of the Clean Air Act, 42 U.S.C. §§ 7661–7661f, establishes a permit program for certain stationary sources of air pollution, including major sources subject to Clean Air Act Section 111 (NSPS regulations), Section 112 (NESHAP/MACT regulations), or New Source Review requirements. *See* 42 U.S.C. § 7661a(a).

88.    The purpose of Title V is to ensure that all "applicable requirements" governing a facility's compliance with the Clean Air Act, including SIP requirements, are consolidated and expressed in one document – an "operating" permit (*a.k.a.* a "Title V permit"). *See* 42 U.S.C. § 7661c(a).

89.    Pursuant to Clean Air Act Section 502(b), 42 U.S.C. § 7661a(b), the EPA promulgated regulations implementing the requirements of Title V and establishing the minimum elements of a Title V permit program to be administered by any state or local air pollution control agency. 57 Fed. Reg. 32250 (July 21, 1992). These regulations are codified at 40 C.F.R. Part 70.

90.    EPA has approved Kentucky's Title V air operating permit programs. 401 KAR Chapter 52. *See* 66 Fed. Reg. 54,953 (Oct. 31, 2001); 40 C.F.R. Part 70 Appendix A. Kentucky is therefore authorized to issue and enforce Title V permits in the Commonwealth of Kentucky. The regulations governing Kentucky's Title V air operating permit program are set forth at 401 KAR 52:020 (Title V Permits).

91.     EPA has approved Louisiana's Title V air operating permit program. 60 Fed. Reg. 47,296-97 (Sept. 12, 1995); 40 C.F.R. Part 70 Appendix A. Louisiana is therefore authorized to issue and enforce Title V permits in the State of Louisiana. The regulations governing Louisiana's Title V air operating permit program are set forth at LAC Title 33, Part III, Chapter 5 (Permit Procedures).

92.     In all respects relevant to this Complaint, the Title V regulations of Kentucky and Louisiana closely, if not exactly, mirror the federal Title V regulations codified at 40 C.F.R. Part 70.

93.     Clean Air Act Section 504(a), 42 U.S.C. § 7661c(a), the implementing regulations at 40 C.F.R. § 70.6(a) and (c), and the Title V permit programs of Kentucky and Louisiana require that each Title V permit include, among other things, enforceable emission limitations, compliance schedules, and such other conditions as are necessary to assure compliance with "applicable requirements" of the Clean Air Act and the requirements of the relevant SIP. *See* 401 KAR 50:020, Section 3; LAC 33:III.501.C and 507.A.3.

94.     "Applicable requirements" are defined to include any relevant NSPS, NESHAP/MACT, and New Source Review requirements. *See* 40 C.F.R. § 70.2; *see also* 401 KAR 52:001, Section 1(34) (defining "federally enforceable requirement"); LAC 33:III.502 (defining "Federally Applicable Requirement").

95.     Clean Air Act Section 502(a), 42 U.S.C. § 7661a(a), and the Title V permit programs of Kentucky and Louisiana prohibit violations of any requirement of a Title V permit. *See* 401 KAR 52:020, Section 3(1)(b); LAC 33:III.501.C and 507.B.

96.     Clean Air Act Section 502(a), 42 U.S.C. § 7661a(a), the implementing regulations at 40 C.F.R. §§ 70.1(b) and 70.7(b), and the Title V permit programs of Kentucky and Louisiana

provide that no source subject to Title V may operate except in compliance with a Title V permit. *See* 401 KAR 52:020, Section 3(1)(b); LAC 33:III.501.C and 507.B.

97.    Under Kentucky's Title V operating permit program, no source subject to Title V may construct, reconstruct, modify or operate without a Title V permit approved and issued by KDEP. *See* 401 KAR 52:020, Section 3(1)(a) and (b). Any such permit issued must incorporate all federally applicable requirements. *See* 401 KAR 52:020, Section 10 (incorporating by reference KDEP's Cabinet Provisions and Procedures for Issuing Title V Permits) and requiring such permits to include all "applicable requirements," defined as "a state-origin or federally enforceable requirement or standard that applies to a source." *See* 401 KAR 52:001, Section 1(15).

98.    Under Louisiana's Title V operating permit program, no construction, modification, or operation of a facility that ultimately may result in an initiation or increase in emissions may begin until a Title V permit has been approved and issued by LDEQ. LAC 33:III.501.C, 507.B.2, and 517.A. Any such permit issued must incorporate all federally applicable requirements. *See* LAC 33:III.501.C, 507.A.3, and 507.B.2.

99.    Clean Air Act Section 503(c), 42 U.S.C. § 7661b(c), the implementing regulations at 40 C.F.R. § 70.5(a), and the Title V permit programs of Kentucky and Louisiana provide that each owner and operator of a source subject to Title V permitting requirements must submit a permit application.

100.    Clean Air Act Section 503(b), 42 U.S.C. § 7661b(b), and 40 C.F.R. §§ 70.5(a)(2) and (c), provide that any person required to have a Title V permit must submit as part of its permit application, among other things, a compliance plan to the permitting authority

that describes how the source will comply or come into compliance with each applicable requirement of the Clean Air Act. *See* 401 KAR 52:020, Section 5(8); LAC 33:III.501.C, 507.H.

101.     In addition, the Title V permit application must contain information sufficient to evaluate the relevant characteristics of the source and its permit application, and to determine all applicable requirements (including any requirement to meet the applicable control technology requirements under the PSD program, and requirements to comply with the applicable NSPS and/or NESHAP/MACT standards). *See* 40 C.F.R. § 70.5(a) and (c); 401 KAR 52:020, Section 5; LAC 33:III.501.C, 507.H, and 517.B, D, and E.

102.     The permit application must also contain a compliance plan for all applicable requirements for which the source is not in compliance and a certification of compliance with all applicable requirements. *See* 42 U.S.C. § 7661b(b) and 40 C.F.R. § 70.5(a) and (c)(8)-(9).

103.     Under 40 C.F.R. § 70.5(b) and the Title V permit programs of Kentucky and Louisiana, any applicant who fails to submit any relevant facts or who has submitted incorrect information in a permit application must, upon becoming aware of such failure or incorrect submittal, promptly submit such supplementary facts or corrected information. *See* 401 KAR 52:020, Section 7; LAC 33:III.501.C, and 517(C).

104.     All terms and conditions of a Title V permit are enforceable by the EPA. 42 U.S.C. § 7413(b); 40 C.F.R. § 70.6(b).

**F.     Enforcement of the Clean Air Act**

105.     Clean Air Act Sections 113(a)(1) and (a)(3), 42 U.S.C. §§ 7413(a)(1) and (a)(3), authorize the EPA to bring a civil action under Section 113(b) whenever, on the basis of any information available to the EPA, the EPA finds that any person has violated or is in violation of, *inter alia*, any requirement or prohibition of a SIP, PSD or Non-attainment NSR requirement, a

PSD or Non-attainment NSR permit, NSPS requirements, NESHAP/MACT requirements, the Title V permit program, or a Title V permit.

106.    Clean Air Act Section 113(b), 42 U.S.C. § 7413(b), authorizes the EPA to initiate a judicial enforcement action for a permanent or temporary injunction to address Clean Air Act violations, as well as to seek civil penalties of up to $37,500 per day for each violation that occurs between January 13, 2009 and November 2, 2015, and up to $109,024 per day for each violation that occurs after November 2, 2015. *See* Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 (note), as amended by 31 U.S.C. § 3701 (note); 40 C.F.R. § 19.4; and 87 Fed. Reg. 1678 (Jan. 12, 2022).

107.    KRS 224.99-010(1) (Penalties) provides that any person who violates KRS 224.20-110 (Air Pollution in Violation of Standards and Rules Prohibited), or who fails to perform any duties imposed by KRS 224.20-110, or who violates any determination, permit, administrative regulation, or order of the cabinet promulgated pursuant thereto shall be liable for a civil penalty not to exceed the sum of twenty-five thousand dollars ($25,000) for each day during which such violation continues, and in addition, may be concurrently enjoined from any violations as provided in KRS 224.99-010 (Penalties) and KRS 224.99-020 (Action to Recover Penalties and Costs—Injunctive Relief).

108.    La. R.S. 30:2025(E)(1)(a) authorizes civil penalties "of not more than the cost to the state of any response action made necessary by such violation which is not voluntarily paid by the violator, and a penalty of not more than $32,500 for each day of violation. However, when any such violation is done intentionally, willfully, or knowingly, or results in a discharge or disposal which causes irreparable or severe damage to the environment or if the substance discharged is one which endangers human life or health, such person may be liable for an

additional penalty of not more than $1,000,000." Further, LDEQ is entitled to injunctive relief without the requisite showing of irreparable injury when the conduct sought to be restrained is unconstitutional or unlawful, *i.e.*, when the conduct sought to be enjoined constitutes a direct violation of a prohibitory law and/or a violation of a constitutional right. *Jurisich v. Jenkins*, 749 So.2d 597 (La. 1999).

## GENERAL ALLEGATIONS

109.    A flare is a combustion device that uses an uncontrolled volume of ambient air to burn and dispose of gases generated by industrial manufacturing processes. Flares are used at chemical manufacturing plants like the Defendants' Facilities, petroleum refineries, and other types of industrial facilities.

110.    Gas generated by facility operations that is directed to a flare for combustion is known as "vent gas."

111.    "Steam-assisted" flares use steam that is piped to the flare tip and injected into the combustion zone to assist in combustion by promoting turbulence within a flare's flame.

112.    "Air-assisted" flares inject air via fans or other means to the flare tip to assist in combustion by promoting turbulence within a flare's flame.

113.    Flares constitute "air pollution control equipment" within the meaning of 40 C.F.R. §§ 60.11(d), 61.12(c), and 63.6(e)(1)(i).

114.    Flares are designed, in part, to achieve high combustion efficiency of VOCs and HAPs.

115.    The steam-to-vent-gas ratio (sometimes referred to as "S:VG") is one operational parameter used to monitor flare operation and combustion efficiency. The net heating value

("NHV") of the gases in the combustion zone of a flare ("Combustion Zone Gas") is another operational parameter that is an indicator of flare combustion efficiency.

116.    As part of its design, a steam-assisted flare must be operated within a range of steam-to-vent gas ratios that, at one end, avoids smoking through an insufficient steam-to-vent gas ratio, and on the other end, avoids incomplete combustion due to an excessive steam-to-vent gas ratio. Both insufficient and excessive steam-to-vent gas ratios reduce VOC and HAP combustion efficiency below a flare's designed efficiency.

117.    Air-assisted flares must be also operated within a range of assist-air-to-vent gas ratios so that these flares achieve their designed combustion efficiency.

118.    Excessive levels of assist-steam or assist-air will reduce combustion efficiency and may effectively quench or snuff the flame.

119.    In order to monitor an assisted flare to ensure that it is operated and maintained in conformance with its design, several actions must be taken. The amount of vent gas and either assist-steam or assist-air flowing to the flare must be monitored. The ratio of the flows of vent gas to either assist-steam or assist-air must be calculated. And, the flow of assist-steam or assist-air must be subject to sufficient control to enable increasing or decreasing it in order to maintain a design-appropriate steam-to-vent gas ratio or air-to-vent gas ratio and a high VOC combustion efficiency.

120.    Good air pollution control practices to minimize emissions from flares include, *inter alia*, combusting essentially all molecules of hydrocarbons (which include VOCs) and HAPs in the vent gas sent to a flare. In order to allow for complete combustion of these substances, vent gas must have sufficient heating value and oxygen.

121.    For assisted flares, good air pollution control practices to minimize emissions from flares requires, *inter alia*, injecting either assist-steam or assist-air at a rate that maximizes flame stability and flare combustion efficiency.

122.    In order to inject assist-steam or assist-air at a proper rate, good air pollution control practices to minimize emissions from assisted flares include taking the following actions: The amount of vent gas and either assist-steam or assist-air flowing to the flare must be monitored. The ratio of the flows of vent gas to either assist-steam or assist-air must be calculated. And, the flow of assist-steam or assist-air must be subject to sufficient control to enable increasing or decreasing it in order to optimize the S:VG or assist-air-to-vent gas ratio, maintain a sufficient NHV of the Combustion Zone Gas, and maintain a high VOC and HAP combustion efficiency.

123.    At all times relevant to the Complaint, subject to a reasonable opportunity for further investigation and discovery, each of the Defendants' Facilities is a chemical process plant that has emitted or had the potential to emit at least 10 TPY or more of any individual HAP or 25 TPY or more of any combination of HAPs.

124.    At all times relevant to the Complaint, subject to a reasonable opportunity for further investigation and discovery, each of the Defendants' Facilities has met the definition of:

  a. "Major emitting facility," as defined by Clean Air Act Section 169(1), 42 U.S.C. § 7479(1), and the implementing NSR regulations;

  b. "Major stationary source," as defined by 40 C.F.R. § 52.21(b)(1)(i)(a);

  c. "Stationary source" as defined by 42 U.S.C. § 7411(a)(3) and the implementing NSPS regulations;

  d. "Major source" of HAPs, as defined by 42 U.S.C. § 7412(a)(1) and the implementing NESHAP and MACT regulations; and

e. "Major source," as defined by 42 U.S.C. § 7661a(2) and the implementing Clean Air Act Title V regulations.

125. At all times relevant to the Complaint, subject to a reasonable opportunity for further investigation and discovery, the Calvert City Plant has met the definitions in the federally approved Kentucky SIP that adopt, incorporate, or implement the programs and regulations listed in Paragraph 124.

126. At all times relevant to the Complaint, subject to a reasonable opportunity for further investigation and discovery, the Lake Charles Plants have met the definitions in the federally approved Louisiana SIP that adopt, incorporate, or implement the programs and regulations listed in Paragraph 124.

**A. NSPS general allegations:**

i. NSPS Subpart DDD (VOC Emissions from Polymer Manufacturing)—Lake Charles Plants

127. At all times relevant to this Complaint, one or more flares used by one or more Defendants at the Lake Charles Plants have been subject to the requirements of NSPS Subpart DDD. 40 C.F.R. § 60.560-1(a)(1).

128. At all times relevant to this Complaint, one or more Defendants have owned and operated process units and equipment involved in the manufacture of polypropylene, polyethylene, polystyrene, and/or poly (ethylene terephthalate), as defined in 40 C.F.R. § 60.561, at the Lake Charles Plants. 40 C.F.R. § 60.560(a).

129. The process units and equipment involved in the manufacture of polypropylene, polyethylene, polystyrene, and/or poly (ethylene terephthalate), as defined in 40 C.F.R. § 60.561, at the Lake Charles Plants constitute affected facilities within the meaning of NSPS Subpart DDD. 40 C.F.R. § 60.560(a).

28

130.     At all times relevant to this Complaint, one or more Defendants have used one or more flares to control continuous emission streams from an affected facility subject to NSPS Subpart DDD at the Lake Charles Plants. 40 C.F.R. §§ 60.560-1(a)(1)(i)(C) and (ii) and 60.563(c).

ii.      NSPS Subpart NNN (VOC Emissions from SOCMI Distillation Units)—Calvert City Plant and Lake Charles Plants

131.     At all times relevant to this Complaint, one or more flares used by one or more Defendants at the Calvert City Plant, has been subject to the requirements of NSPS Subpart NNN. 40 C.F.R. § 60.662(b).

132.     At all times relevant to this Complaint, one or more flares used by one or more Defendants at the Lake Charles Plants, have been subject to the requirements of NSPS Subpart NNN. *Id.*

133.     At all times relevant to this Complaint, one or more Defendants have owned and operated distillation units, which are affected facilities within the meaning of NSPS Subpart NNN, that produce one or more of the chemicals listed in 40 C.F.R. § 60.667 at the Calvert City Plant and the Lake Charles Plants. 40 C.F.R. § 60.660(a) and (b).

134.     At all times relevant to this Complaint, one or more Defendants have used one or more flares to combust vent streams and emissions from affected facilities subject to NSPS Subpart NNN at the Calvert City Plant and the Lake Charles Plants. 40 C.F.R. § 60.662(b).

iii.     NSPS Subpart RRR (Standards of Performance for Volatile Organic Compound Emissions From Synthetic Organic Chemical Manufacturing Industry (SOCMI) Reactor Processes)—Calvert City Plant

135.     At all times relevant to this Complaint, one or more flares used by one or more Defendants at the Calvert City Plant, have been subject to the requirements of NSPS Subpart RRR. 40 C.F.R. § 60.662(b).

136.    At all times relevant to this Complaint, one or more Defendants have owned and operated reactor processes, which are affected facilities within the meaning of NSPS Subpart RRR, that produce one or more of the chemicals listed in 40 C.F.R. § 60.707 at the Calvert City Plant. 40 C.F.R. § 60.700(a) and (b).

137.    At all times relevant to this Complaint, one or more Defendants have used one or more flares to combust vent streams and emissions from affected facilities subject to NSPS Subpart RRR at the Calvert City Plant. 40 C.F.R. § 60.702(b).

**B.  NESHAP general allegations:**

   i.    NESHAP Subpart F (National Emission Standard for Vinyl Chloride)—Calvert City Plant

138.    At all times relevant to this Complaint, one or more flares used by one or more Defendants at the Calvert City Plant have been subject to the requirements of 40 C.F.R. Part 61, Subpart F. 40 C.F.R. § 61.65(d)(2)(i) and (ii).

139.    At all times relevant to this Complaint, the Calvert City Plant has been an ethylene dichloride, vinyl chloride, or polyvinyl chloride plant, within the meaning of 40 C.F.R. Part 61, Subpart F. 40 C.F.R. § 61.61(a), (b), and (c).

140.    Ethylene dichloride, vinyl chloride, and polyvinyl chloride plants as defined by 40 C.F.R. § 61.61, including the Calvert City Plant, are affected sources within the meaning of 40 C.F.R. Part 61, Subpart F. 40 C.F.R. § 61.60(a).

141.    At all times relevant to this Complaint, one or more Defendants have owned and operated a plant that produce ethylene dichloride, vinyl chloride, and/or polyvinyl chloride plant and generates vinyl chloride-containing waste streams subject to the NESHAP for Vinyl Chloride at the Calvert City Plant. 40 C.F.R. § 61.65.

142.    At all times relevant to this Complaint, the Defendants have used one or more relief valves and flares as control devices for the vinyl chloride-containing waste streams and process units subject to the NESHAP for Vinyl Chloride at the Calvert City Plant. 40 C.F.R. § 61.65(d).

        ii.   NESHAP Subpart FF (National Emission Standard for Benzene Waste Operations)—Lake Charles Plants

143.    At all times relevant to this Complaint, one or more flares used by one or more of the Defendants at the Lake Charles Plants have been subject to the requirements of 40 C.F.R. Part 61, Subpart FF. 40 C.F.R. § 61.349(a)(2)(iii) and (d).

144.    At all times relevant to this Complaint, the Lake Charles Plants have been chemical manufacturing plants within the meaning of 40 C.F.R. Part 61, Subpart FF. 40 C.F.R. § 61.341.

145.    Chemical manufacturing plants as defined by 40 C.F.R. § 61.341, including the Lake Charles Plants, are affected sources within the meaning of 40 C.F.R. Part 61, Subpart FF. 40 C.F.R. § 61.340(a).

146.    At all times relevant to this Complaint, the Defendants have owned and operated one or more process units that generate benzene-containing waste streams subject to the NESHAP for Benzene Waste Operations at the Lake Charles Plants. 40 C.F.R. § 60.342(c).

147.    At all times relevant to this Complaint, one or more Defendants have used one or more closed vent systems and flares as control devices for the benzene-containing waste streams and process units subject to the NESHAP for Benzene Waste Operations at the Lake Charles Plants. 40 C.F.R. § 61.349(a)(2)(iii) and (d).

## C. **MACT general allegations**:

      i.   <u>Part 63, Subparts H (National Emission Standards for Organic Hazardous Air Pollutants for Equipment Leaks)—Lake Charles Plants</u>

148.    40 C.F.R. Part 63, Subparts F and H set forth related Clean Air Act requirements for stationary sources involved in synthetic organic chemical manufacturing ("SOCMI Sources"). This set of regulations, together with 40 C.F.R. Part 63, Subpart G, is sometimes referred to as the "hazardous organic NESHAP" ("HON") standards.

149.    40 C.F.R Part 63, Subpart F provides general applicability criteria for SOCMI Sources, including whether certain SOCMI Sources are, in turn, subject to 40 C.F.R. Part 63 Subpart H (for equipment leaks from SOCMI Sources). 40 C.F.R. § 63.110(a).

150.    Owners and operators of SOCMI Sources that are subject to 40 C.F.R. Part 63, Subpart F are required to comply with applicable parts of 40 C.F.R. Part 63, Subparts H. 40 C.F.R. § 63.102(a).

151.    The affected source under the HON standards also includes equipment required by or used as a method of compliance with 40 C.F.R. Part 63, Subparts F or H, including control devices such as flares. 40 C.F.R. § 63.100(e).

152.    At all times relevant to this Complaint, one or more flares used by the Defendants at the Lake Charles Plants have been subject to the requirements of 40 C.F.R. Part 63, Subparts F and H.

153.    At all times relevant to this Complaint, one or more Defendants have owned and operated "chemical manufacturing process units" within the meaning of 40 C.F.R. § 63.101(b) at the Lake Charles Plants.

154.    At all times relevant to this Complaint, the Defendants have manufactured as a primary product one or more of the chemicals listed in Table 1 of 40 C.F.R. Part 63, Subpart F at

the Lake Charles Plants. 40 C.F.R. § 63.100(b). These chemicals include benzene, butadiene, hexane, isobutylene, methyl ethyl ketone, naphthalene, and phthalic anhydride.

155.    At all times relevant to this Complaint, the Defendants have used as a reactant or manufactured as a product, or co-product, one or more of the organic HAPs listed in Table 2 of 40 C.F.R. Part 63, Subpart F at the Lake Charles Plants. 40 C.F.R. § 63.100(b). These organic HAPs include acetaldehyde, acrolein, benzene, ethylbenzene, ethylene glycol, formaldehyde, methyl tertiary butyl ether, naphthalene, toluene, vinyl acetate, and xylene.

156.    At all times relevant to this Complaint, one or more Defendants have owned and operated equipment within SOCMI Sources that are subject to 40 C.F.R. Part 63, Subpart H, or subject to other subparts of 40 C.F.R. Part 63 that reference 40 C.F.R. Part 63, Subpart H, at the Lake Charles Plants. This equipment includes pumps, compressors, agitators, pressure relief devices, sampling connection systems, open-ended valves or lines, valves, connectors, surge control vessels, bottoms receivers, instrumentation systems, and/or control devices or closed vent systems required by 40 C.F.R. Part 63, Subpart H, that are intended to operate in organic HAP service 300 hours or more during the calendar year. This equipment is an affected source subject to the requirements of 40 C.F.R. Part 63, Subpart H. 40 C.F.R. § 63.160(a).

157.    At all times relevant to this Complaint, one or more Defendants have used one or more closed vent systems and flares as control devices for SOCMI Sources, process vents, and equipment subject to 40 C.F.R. Part 63, Subparts F or H at the Lake Charles Plants. 40 C.F.R. Part 63, Subpart F, Table 3 (applicability for Subparts F and H); 40 C.F.R. Part 63.172(d) and (e) (Subpart H).

    ii.   <u>Part 63, Subpart YY (MACT for Ethylene Production Process Vents and Equipment)—Calvert City Plant and Lake Charles Plants</u>

158.    At all times relevant to this Complaint, one or more flares used by the Defendants at the Calvert City Plant and Lake Charles Plants have been subject to the requirements of 40 C.F.R. Part 63, Subpart YY.

159.    At all times relevant to this Complaint, the Defendants have owned and operated ethylene process vents from continuous ethylene production unit operations within the meaning of 40 C.F.R. § 63.1103(e)(2) at the Calvert City Plant and Lake Charles Plants. These process vents are affected sources within the ethylene production source category regulated by 40 C.F.R. Part 63, Subpart YY. 40 C.F.R. §§ 63.1100(a), Table 1 and 63.1103(e)(1)(i)(B).

160.    At all times relevant to this Complaint, the Defendants have owned and operated equipment that contains or contacts organic HAPs within the meaning of 40 C.F.R. § 63.1101 and that is subject to 40 C.F.R. Part 63, Subpart YY. This equipment includes pumps, compressors, agitators, pressure relief devices, sampling collection systems, open-ended valves or lines, valves, connectors, and/or instrumentation systems in organic HAP service, as defined in 40 C.F.R. § 63.1103, for the ethylene production process unit(s) at the Calvert City Plant and the Lake Charles Plants. This equipment is an affected source under 40 C.F.R. Part 63, Subpart YY. 40 C.F.R. § 63.1103(e)(1)(i)(D).

161.    At all times relevant to this Complaint, the Defendants have used one or more closed vent systems and flares as control devices for the process vents and equipment subject to 40 C.F.R. Part 63, Subpart YY at the at the Calvert City Plant and the Lake Charles Plants. 40 C.F.R. § 63.1103(e), Table 7 (for process vents, cross-referencing to: 40 C.F.R. § 63.982(b) and, in turn, 40 C.F.R. § 63.987(a)) and (for equipment, cross-referencing to: 40 C.F.R. § 63.1034(b)(2)(iii) and, in turn, 40 C.F.R. § 63.987(a)).

D. **Title V general allegations:**

162.    At all times relevant to this Complaint, the Calvert City Plant has been subject to the Title V permitting requirements in 40 C.F.R. Part 70 and the federally approved Kentucky SIP.

163.    At all times relevant to this Complaint, the Lake Charles Plants have been subject to the Title V permitting requirements in 40 C.F.R. Part 70 and the federally approved Louisiana SIP.

164.    At all times relevant to this Complaint, each of Defendants' Facilities has been subject to a federally enforceable Title V permit issued pursuant to the Kentucky SIP or the Louisiana SIP that requires, among other things, that the Ethylene Flare, Vinyl Chloride Flare, Petro Flare 1, Petro Flare 2, Styrene Flare, Poly 3 LP Flare, and Co-Products Flare comply with the requirements of 40 C.F.R. §§ 60.11(d), 61.12(c), or 63.6(e)(1)(i).

165.    At all times relevant to this Complaint, each of Defendants' Facilities has been subject to a federally enforceable Title V permit issued pursuant to the Kentucky SIP or the Louisiana SIP that requires, among other things, that the Ethylene Flare, Vinyl Chloride Flare, Petro Flare 1, Petro Flare 2, Styrene Flare, Poly 3 LP Flare, and Co-Products Flare comply with the requirements of 40 C.F.R. §§ 60.18 or 40 C.F.R. § 63.11.

## FIRST CLAIM FOR RELIEF

### (Violations of New Source Review Requirements)

166.    Paragraphs 6–46 and 105–126 are re-alleged and incorporated by reference.

167.    Subject to a reasonable opportunity for investigation and discovery, from 2013 to the present, the Defendants "commenced construction" of one or more "major modification[s],"

as defined in the Clean Air Act, the Kentucky SIP, and the Louisiana SIP, at the Calvert City Plant and at the Lake Charles Plants.

168.    Subject to a reasonable opportunity for investigation and discovery, the Defendants made physical changes and/or changes in the methods of operation to one or more of the flares or closed vent systems (also known as flare "headers") that transport gases from manufacturing process units to the flares at the Calvert City Plant and the Lake Charles Plants. Subject to a reasonable opportunity for investigation and discovery, these modifications included changes to the flare stacks, flare tips, main flare headers, and/or process unit sub-headers.

169.    Subject to a reasonable opportunity for investigation and discovery, one or more of these modifications resulted in a significant net emissions increase of NOx, VOCs, and/or CO from one or more of the flares at the Calvert City Plant or the Lake Charles Plants.

170.    The Defendants did not apply for, obtain, or operate pursuant to a PSD permit or Non-attainment NSR permit, as applicable, for any of these major modifications.

171.    Subject to a reasonable opportunity for investigation and discovery, the Defendants failed to comply with various requirements of the PSD regulations for NOx, VOCs, and/or CO, at the Calvert City Plant and the Lake Charles Plants. Subject to a reasonable opportunity for investigation and discovery, the Defendants failed to, among other things: (i) install and operate BACT for the flare systems for one or more flares at these facilities; (ii) demonstrate that the emissions increases from the modifications would not cause or contribute to violations of air quality standards; and (iii) otherwise comply with the requirements of the PSD program and the corresponding implementing provisions of the Kentucky and Louisiana SIPs.

172.    Subject to a reasonable opportunity for investigation and discovery, the

36

Defendants failed to comply with various requirements of the Non-attainment NSR regulations for NOx, VOCs, and/or CO, at the Calvert City Plant or the Lake Charles Plants. Subject to a reasonable opportunity for investigation and discovery, Defendants failed to, *inter alia*, i) comply with LAER for the flare systems for one or more flares at these facilities; ii) secure emissions reductions (offsets) from existing sources in the same air quality region where the facility is located such that there would be a reasonable progress toward attainment of the applicable NAAQS; and iii) otherwise comply with the requirements of the Non-attainment NSR regulations and the corresponding implementing provisions of the Kentucky and Louisiana SIPs.

173.    Subject to a reasonable opportunity for investigation and discovery, since the time the Defendants commenced construction of the major modifications alleged herein, the Defendants have violated:

(a)    42 U.S.C. § 7475(a);

(b)    40 C.F.R. §§ 52.21(a)(2)(iii) and 52.21(i)–52.21(r)(5);

(c)    40 C.F.R. Part 51, Appendix S, Part IV.A, Conditions 1-4; and

(c)    The federally enforceable corollary provisions of the Kentucky and Louisiana SIPs that adopt, incorporate, and/or implement the requirements cited in sub-paragraphs 173(a)–(b).

174.    Unless restrained by an order of this Court, the violations alleged in this Claim for Relief will continue.

175.    As provided in Clean Air Act Section 113(b), 42 U.S.C. § 7413(b), the violations set forth above subject the Defendants to injunctive relief and civil penalties. *See also* 40 C.F.R. § 19.4. Defendants Westlake Chemical OpCo LP and Westlake Vinyls, Inc. are also liable for injunctive relief and civil penalties pursuant to KRS 224.99-010(1) for the violations set forth above that occurred at the Calvert City Plant. Defendants Westlake Chemical OpCo LP,

Westlake Petrochemicals LLC, and Westlake Styrene LLC are also liable for injunctive relief and civil penalties pursuant to La. R.S. 30:2025(E)(1)(a) for the violations set forth above that occurred at the Lake Charles Plants.

### SECOND CLAIM FOR RELIEF

**(Violations of Title V Requirements for New Source Review Violations)**

176.     Paragraphs 6–46, 87–126, and 162-173 are re-alleged and incorporated by reference.

177.     Subject to a reasonable opportunity for investigation and discovery, as alleged in the First Claim for Relief, the Defendants commenced construction of one or more major modifications at the Calvert City Plant and the Lake Charles Plants. These activities triggered requirements, *inter alia*, to: a) obtain PSD permits or Non-attainment NSR permits establishing emissions limitations that meet BACT or LAER, as applicable, for one or more of the flares at the Calvert City Plant and the Lake Charles Plants, b) operate in compliance with BACT or LAER at one or more of these flares, and c) otherwise comply with the requirements of the PSD permit or Non-attainment NSR programs, as applicable. Subject to a reasonable opportunity for investigation and discovery, the Defendants failed to comply with these requirements.

178.     Subject to a reasonable opportunity for investigation and discovery, the Defendants failed to submit complete and timely applications for Title V operating permits for one or more of the flares at the Calvert City Plant and the Lake Charles Plants that, *inter alia,* included enforceable BACT or LAER limits, identified all applicable requirements, accurately certified compliance with such requirements, and contained a compliance plan for all applicable requirements for which the flares were not in compliance.

179.    In the alternative, the Defendants failed to supplement and correct previously submitted incorrect or incomplete Title V permit applications in order to: a) seek enforceable BACT or LAER limits for one or more of the flares at the Calvert City Plant and the Lake Charles Plants, b) identify all applicable requirements, c) accurately certify compliance with such requirements, and d) include a compliance plan for requirements for which the flares were not in compliance.

180.    Subject to a reasonable opportunity for investigation and discovery, the Defendants have operated, and continue to operate, the Calvert City Plant and the Lake Charles Plants without having valid Title V operating permits. The Defendants' Title V operating permits failed to, among other things, require compliance with BACT or LAER, as applicable, for one or more of the flares at the Calvert City Plant and the Lake Charles Plants, failed to identify all applicable requirements, and/or failed to contain a compliance plan for coming into compliance with BACT or LAER, as applicable, at the flares.

181.    Subject to a reasonable opportunity for investigation and discovery, the Defendants' acts and/or omissions constitute violations of:

(a)    42 U.S.C. §§ 7661a(a), 7661b(c), and 7661c(a);

(b)    40 C.F.R. §§ 70.1(b), 70.5(a) - (c), 70.6(a) and (c), and 70.7(b); and

(c)    The federally enforceable corollary provisions of the Kentucky and Louisiana Title V programs that adopt, incorporate, and/or implement any of the federal provisions cited in sub-paragraphs 181(a) and (b).

182.    Unless restrained by an order of this Court, the violations alleged in this Claim for Relief will continue.

183.    As provided in Clean Air Act Section 113(b), 42 U.S.C. § 7413(b), the violations set forth above subject the Defendants to injunctive relief and civil penalties. *See also* 40 C.F.R.

§ 19.4. Defendants Westlake Chemical OpCo LP and Westlake Vinyls, Inc. are liable for injunctive relief and civil penalties pursuant to KRS 224.99-010(1) for the violations set forth above that occurred at the Calvert City Plant. Defendants Westlake Chemical OpCo LP, Westlake Petrochemicals LLC, and Westlake Styrene LLC are also liable for injunctive relief and civil penalties pursuant to La. R.S. 30:2025(E)(1)(a) for the violations set forth above that occurred at the Lake Charles Plants.

### THIRD CLAIM FOR RELIEF

**Violations of NSPS, NESHAP, and MACT Requirements; Title V Permits that Incorporate these Requirements**

**Failure to Monitor to Ensure Flares Are Operated and Maintained in Conformance with their Design**

184.    Paragraphs 6–17 and 47-165 are re-alleged and incorporated by reference.

185.    Since at least 2009, the flares at the Defendants' Facilities have been subject to one or more of the following Clean Air Act regulations: 40 C.F.R. Part 60, Subparts A, DDD, NNN, or RRR; 40 C.F.R. Part 61, Subparts A, F or FF; or 40 C.F.R. Part 63, Subparts, A, H, SS, YY, and FFFF.

186.    Since at least 2009, the flares at the Defendants' Facilities have been subject to a federally enforceable Title V permit that compels compliance with one or more of the following Clean Air Act regulations: 40 C.F.R. Part 60, Subparts A, DDD, NNN, or RRR; 40 C.F.R. Part 61, Subparts A, F or FF; or 40 C.F.R. Part 63, Subparts, A, H, SS, YY, and FFFF.

187.    Since at least 2009, the flares at the Defendants' Facilities have been subject to the requirements of 40 C.F.R. §§ 60.18(d) or 63.11(b)(1).

188.    At various times since at least 2009, the Defendants failed to perform the following at one or more of the Defendants' Facilities: install and/or properly operate vent gas

flow monitors and assist-steam (for steam-assisted flares) or assist-air (for air-assisted flares); calculate steam-to-vent gas ratios (for steam-assisted flares) or assist-air-to-vent gas ratios (for air-assisted flares); and have sufficient controls on steam flow (for steam-assisted flares) or assist-air (for air-assisted flares) to maintain steam-to-vent gas or assist-air-to-vent gas ratios, as applicable, within design parameters.

189.    The Defendants' acts and omissions constitute violations of:

(a)    Clean Air Act Sections 111(e) and 112, 42 U.S.C. §§ 7411(e) and 7412;

(b)    40 C.F.R. §§ 60.18(d) and 63.11(b)(1);

(c)    The provisions of 40 C.F.R. Part 60, Subparts DDD, NNN, or RRR; 40 C.F.R. Part 61, Subparts F or FF; or 40 C.F.R. Part 63, Subparts, H, SS, YY, and FFFF that require flares to comply with the requirements identified in sub-paragraphs 189(a) and (b);

(d)    The federally enforceable corollary provisions of the Kentucky SIP and Louisiana SIP that adopt, incorporate, and/or implement any of the federal provisions cited in sub-paragraphs 189(a)–(c);

(e)    The terms of the Clean Air Act Title V permits for the Defendants' Facilities that require compliance with the requirements identified in sub-paragraphs 189(a)–(d); and

(f)    The prohibition against violating a Clean Air Act Title V permit found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

190.    Unless restrained by an order of this Court, the violations alleged in this Claim for Relief will continue.

191.    As provided in Clean Air Act Section 113(b), 42 U.S.C. § 7413(b), the violations set forth above subject the Defendants to injunctive relief and civil penalties. *See also* 40 C.F.R. § 19.4. Defendants Westlake Vinyls, Inc. and Westlake Chemical OpCo LP are liable for injunctive relief and civil penalties pursuant to KRS 224.99-010(1) for the violations set forth above that occurred at the Calvert City Plant. Defendants Westlake Chemical OpCo LP,

Westlake Petrochemicals LLC, and Westlake Styrene LLC are also liable for injunctive relief and civil penalties pursuant to La. R.S. 30:2025(E)(1)(a) for the violations set forth above that occurred at the Lake Charles Plants.

## FOURTH CLAIM FOR RELIEF

**Violations of NSPS, NESHAP, and MACT Requirements; Title V Permits that Incorporate these Requirements**

### Failure to Operate Flares Consistent with Good Air Pollution Control Practices

192.    Paragraphs 6–17, 47-165, 185-186, and 188 are re-alleged and incorporated by reference.

193.    At various times since at least 2009, the Defendants operated the Calvert City Plant's Flares with an excessively high S:VG.

194.    At various times since at least 2009, the Defendants operated one or more of the Lake Charles Plants' Flares with an excessively high S:VG or assist-air-to-vent gas ratio.

195.    Operating the flares with an excessively high S:VG or assist-air-to-vent gas ratio increased the likelihood of flame quenching or snuffing, reduced flare combustion efficiency, and resulted in excessive emissions from the flares to the atmosphere of un-combusted and partially combusted HAPs and hydrocarbons (including VOCs), CO, and other pollutants.

196.    Since at least 2009, at one or more of the flares at the Defendants' Facilities, the Defendants failed to: a) install or use adequate monitoring to measure the flow of vent gas, assist-steam, and/or assist-air to the flares, b) calculate and monitor the ratio of the flows of vent gas to either assist-steam or assist-air, and c) to install sufficient controls on, or sufficiently control the flow of, assist-steam or assist-air to enable increasing or decreasing it in order to optimize the S:VG or assist-air-to-vent gas ratio, maintain a sufficient NHV of the Combustion Zone Gas, maximize flame stability, and maintain a high VOC combustion efficiency.

197.    The Defendants' acts and omissions constitute violations of:

(a)    Clean Air Act Sections 111(e) and 112, 42 U.S.C. §§ 7411(e) and 7412;

(b)    40 C.F.R. §§ 60.11(d), 61.12(c), and 63.6(e)(1)(i);

(c)    The provisions of 40 C.F.R. Part 60, Subparts DDD, NNN, or RRR; 40 C.F.R. Part 61, Subparts F or FF; or 40 C.F.R. Part 63, Subparts, H, SS, YY, and FFFF that require flares to comply with the requirements identified in sub-paragraphs 197(a) and (b);

(d)    The federally enforceable corollary provisions of the Kentucky SIP and Louisiana SIP that adopt, incorporate, and/or implement the federal provisions cited in sub-paragraphs 197(a)–(c);

(e)    The terms of the Clean Air Act Title V permits for the Defendants' Facilities that require compliance with the requirements identified in sub-paragraphs 197(a)–(d); and

(f)    The prohibition against violating a Clean Air Act Title V permit found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

198.    Unless restrained by an order of this Court, the violations alleged in this Claim for Relief will continue.

199.    As provided in Clean Air Act Section 113(b), 42 U.S.C. § 7413(b), the violations set forth above subject the Defendants to injunctive relief and civil penalties. *See also* 40 C.F.R. § 19.4. Defendants Westlake Vinyls, Inc. and Westlake Chemical OpCo LP are liable for injunctive relief and civil penalties pursuant to KRS 224.99-010(1) for the violations set forth above that occurred at the Calvert City Plant. Defendants Westlake Chemical OpCo LP, Westlake Petrochemicals LLC, and Westlake Styrene LLC are also liable for injunctive relief and civil penalties pursuant to La. R.S. 30:2025(E)(1)(a) for the violations set forth above that occurred at the Lake Charles Plants.

## FIFTH CLAIM FOR RELIEF

**Violations of NSPS, NESHAP, and MACT Requirements; Title V Permits that Incorporate these Requirements**

### Combusting Gas in Flares with a Net Heating Value Less than 300 BTU/scf

200.    Paragraphs 6–17, 47-165, 185-186, 188, and 196 are re-alleged and incorporated by reference.

201.    Since at least 2009, the flares at the Defendants' Facilities have been subject to the requirements of 40 C.F.R. §§ 60.18(c)(3) and/or 63.11(b)(6).

202.    At various times since at least 2009, the Defendants combusted gas that had a net heating value less than 300 BTU/scf in one or more of the flares at the Defendants' Facilities.

203.    Since at least 2009, the flares at the Defendants' Facilities have been subject to the requirements of 40 C.F.R. §§ 60.11(d), 61.12(c), or 63.6(e)(1)(i).

204.    At various times since at least 2009, the Defendants operated one or more of the Calvert City Plant's Flares without sufficient Net Heating Value in the Combustion Zone Gas.

205.    Operating the flares at an insufficient NHV reduced combustion efficiency and resulted in excessive emissions from the flares to the atmosphere of un-combusted and partially combusted HAPs and hydrocarbons (including VOCs), CO, and other pollutants.

206.    The Defendants' acts and omissions constitute violations of:

(a)    Clean Air Act Sections 111(e) and 112, 42 U.S.C. §§ 7411(e) and 7412;

(b)    40 C.F.R. §§ 60.18(c)(3)(ii) and 63.11(b)(6)(ii);

(c)    The provisions of 40 C.F.R. Part 60, Subparts DDD, NNN, or RRR; 40 C.F.R. Part 61, Subparts F or FF; or 40 C.F.R. Part 63, Subparts, H, SS, YY, and FFFF that require flares to comply with the requirements identified in sub-paragraphs 206(a) and (b);

(d)     The federally enforceable corollary provisions of the Kentucky SIP and Louisiana SIP that adopt, incorporate, and/or implement the federal provisions cited in sub-paragraphs 206(a)–(c);

(e)     The terms of the Clean Air Act Title V permits for the Defendants' Facilities that require compliance with the requirements identified in sub-paragraphs 206(a)-(d); and

(f)     The prohibition against violating a Clean Air Act Title V permit found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

207.    Unless restrained by an order of this Court, the violations alleged in this Claim for Relief will continue.

208.    As provided in Clean Air Act Section 113(b), 42 U.S.C. § 7413(b), the violations set forth above subject the Defendants to injunctive relief and civil penalties. *See also* 40 C.F.R. § 19.4. Defendants Westlake Vinyls, Inc. and Westlake Chemical OpCo LP are liable for injunctive relief and civil penalties pursuant to KRS 224.99-010(1) for the violations set forth above that occurred at the Calvert City Plant. Defendants Westlake Chemical OpCo LP, Westlake Petrochemicals LLC, and Westlake Styrene LLC are also liable for injunctive relief and civil penalties pursuant to La. R.S. 30:2025(E)(1)(a) for the violations set forth above that occurred at the Lake Charles Plants.

## SIXTH CLAIM FOR RELIEF

**Violations of NSPS, NESHAP, and MACT Requirements; Title V Permits that Incorporate these Requirements**

**Visible Emissions; Operation without a Flame Present;
Exit Velocity; and Failure to Operate When Emissions are Vented**

209.    Paragraphs 6–17, 47-165, 185-186, 188, and 196 are re-alleged and incorporated by reference.

210.    Since at least 2009, the flares at the Defendants' Facilities have been subject to the requirements of 40 C.F.R. §§ 60.18(b) and/or 63.11(b).

211.    At various times since at least 2009, the Defendants operated one or more flares at the Defendants' Facilities: with visible emissions, at times when no flame was present, and/or without complying with maximum exit velocity requirements. During this time, the Defendants also failed to operate one or more flares at the Defendants' Facilities at all times when emissions were vented to the flare(s).

212.    The Defendants' acts and/or omissions constitute violations of:

(a)    Clean Air Act Sections 111(e) and 112, 42 U.S.C. §§ 7411(e) and 7412;

(b)    40 C.F.R. §§ 60.18(c)(1) and 63.11(b)(4);

(c)    40 C.F.R. §§ 60.18(c)(2) and 63.11(b)(5);

(d)    40 C.F.R. §§ 60.18(c)(4)-(5) and 63.11(b)(7)-(8);

(e)    40 C.F.R. §§ 60.18(e) and 63.11(b)(3);

(f)    The provisions of 40 C.F.R. Part 60, Subparts DDD, NNN, or RRR; 40 C.F.R. Part 61, Subparts F or FF; or 40 C.F.R. Part 63, Subparts, H, SS, YY, and FFFF that require flares to comply with the requirements identified in sub-paragraphs 212(a)–(e);

(g)    The federally enforceable corollary provisions of the Kentucky SIP and Louisiana SIP that adopt, incorporate, and/or implement any of the federal provisions cited in sub-paragraphs 212(a)–(f);

(h)    The terms of the Clean Air Act Title V permits for the Defendants' Facilities that require compliance with the requirements identified in sub-paragraphs 212(a)–(g); and

(i)    The prohibition against violating a Clean Air Act Title V permit found at 42 U.S.C. § 7661a(a) and 40 C.F.R. § 70.7(b).

213.    Unless restrained by an order of this Court, the violations alleged in this Claim for Relief will continue.

214.    As provided in Clean Air Act Section 113(b), 42 U.S.C. § 7413(b), the violations set forth above subject the Defendants to injunctive relief and civil penalties. *See also* 40 C.F.R.

§ 19.4. Defendants Westlake Vinyls, Inc. and Westlake Chemical OpCo LP are liable for injunctive relief and civil penalties pursuant to KRS 224.99-010(1) for the violations set forth above that occurred at the Calvert City Plant. Defendants Westlake Chemical OpCo LP, Westlake Petrochemicals LLC, and Westlake Styrene LLC are also liable for injunctive relief and civil penalties pursuant to La. R.S. 30:2025(E)(1)(a) for the violations set forth above that occurred at the Lake Charles Plants.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States, the KDEP, and the LDEQ respectfully request that this Court:

A.      Enter judgment in favor of the United States, the KDEP, and the LDEQ and against Defendants;

B.      Order the Defendants to take all actions necessary to operate the flares at the Defendants' Facilities in compliance with the Clean Air Act requirements that this Complaint alleges the Defendants violated, including the applicable requirements of the Kentucky and Louisiana SIPs;

C.      Permanently enjoin the Defendants from operating the flares at the Defendants' Facilities except in accordance with the Clean Air Act and applicable regulatory requirements, including the Kentucky and Louisiana SIPs;

D.      Order the Defendants to take other appropriate actions to remedy, mitigate, and offset the harm caused by their alleged Clean Air Act violations by, among other things, requiring the Defendants to address or offset their unlawful emissions;

E.      Assess a civil penalty under the Clean Air Act against the Defendants of up to $37,500 per day for each violation occurring between January 13, 2009 and November 2, 2015;

and up to $109,024 per day for each violation occurring after November 2, 2015.

F.    Assess a civil penalty in favor of the KDEO under KRS 224.99-010(1) against the Defendants Westlake Vinyls, Inc. and Westlake Chemical OpCo LP of up to $25,000 per day for each violation.

G.    Assess a civil penalty in favor of the LDEQ under La. R.S. 30:2025(E)(1)(a) against the Defendants Westlake Chemical OpCo LP, Westlake Petrochemicals LLC, Westlake Styrene LLC, and Westlake Polymers LLC  of up to $32,500 for each day of violation, plus, should the evidence show that the any violation was done intentionally, willfully, or knowingly, or resulted in a discharge or disposal which caused irreparable or severe damage to the environment or if the substance discharged is one which endangered human life or health, an additional penalty of not more than $1,000,000.

H.    Award the United States, the KDEP, and the LDEQ their costs and expenses incurred in this action; and

I.    Grant the United States, the KDEP, and the LDEQ any further and other relief that this Court may deem appropriate.

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

*Thomas P. Carroll*
_____

Trial Attorney    THOMAS P. CARROLL
District of Columbia Bar No. 388593
Assistant Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
202-514-1134 (Phone)
202-616-6584 (Fax)

thomas.carroll@usdoj.gov

BRANDON B. BROWN
United States Attorney
Western District of Louisiana

<u>Local of Counsel</u>:     DESIREE C. WILLIAMS (#30978)
Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, Louisiana 70501
Telephone: (337) 262-6618
Facsimile: (337) 262-6682
Email: desiree.williams@usdoj.gov

OF COUNSEL:
Robert Parrish, Attorney-Advisor
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W. (2242A)
Washington, D.C. 20460

ATTORNEYS FOR THE UNITED STATES

**FOR THE KENTUCKY DEPARTMENT FOR ENVIRONMENTAL PROTECTION**

CHRISTOPHER FITZPATRICK, General Counsel
(Ky. Bar # 82179)
Department for Environmental Protection
Office of Legal Services
Commonwealth of Kentucky
Energy and Environment Cabinet
300 Sower Boulevard
Frankfort, Kentucky 40601

**FOR THE LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY**


_Dwana King_

BRANDON WILLIAMS, Trial Attorney (La. Bar #27139)
DWANA KING, Deputy General Counsel
(La. Bar # 20590)
Office of the Secretary, Legal Affairs Division
Louisiana Department of Environmental Quality
P.O. Box 4302
Baton Rouge, Louisiana 70821-4302
Dwana.King@La.Gov
Brandon.Williams@La.Gov